COURT OF APPEALS
DECISION
DATED AND FILED

July 9, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2173-CR**

Cir. Ct. No. 2016CF353

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

KYLE C. ENGEN,

DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Portage County: PATRICIA BAKER, Judge. *Affirmed.*

Before Kloppenburg, Nashold, and Taylor, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Kyle Engen appeals a judgment of conviction following a jury trial and an order denying his postconviction motion. Engen

argues that the prosecutor committed misconduct by commenting on Engen's exercise of his right to silence, stating that the police believed that Engen was guilty, and implying that the defense suborned perjury. He contends that, because of the prosecutorial misconduct, he is entitled to a new trial based on plain error, in the interest of justice, or ineffective assistance of counsel for failing to object. Additionally, he argues that his trial counsel was ineffective for failing to present evidence by a bloodstain pattern analyst. For the reasons explained in this opinion, we reject these arguments and affirm.

¶2    Engen was charged with second-degree intentional homicide, two counts of attempted second-degree intentional homicide, and possession of a firearm by a felon. The charges were based on a shooting following a botched drug deal that resulted in the death of Deonte Lezine. At trial, there was no dispute that Lezine and two other individuals were in a car and picked Engen up from a gas station for a purported plan for Engen to sell them a large amount of marijuana. Engen, who was carrying a backpack, got in the back seat of the car with Lezine. Lezine, who was a boxer, started punching Engen. Engen got out of the car with his backpack and then took a gun from the backpack and fired several shots towards the car, striking the car and shattering the back windshield, and also striking Lezine and the driver of the car. The car drove away and parked near a gym. Lezine exited the car and went into the gym, where he collapsed. He was taken to a hospital and later died.

¶3    The State's trial theory was that Lezine had taken the marijuana from Engen and that Lezine was still in the car when Engen shot at it as it drove away. The State surmised that Engen shot at the car because he was mad that he had been robbed or in an attempt to retrieve the marijuana. In support, the State presented testimony from the two people in the car who had arrived with Lezine

2

for the marijuana purchase and who were in the front seats of the car when the incident occurred. While their testimony was not entirely consistent, they both testified that there was a fight between Lezine and Engen in the back seat of the car, and that Engen shot multiple times at the car while it was driving away with Lezine in the back seat. Additionally, the State presented testimony by several people Engen talked to after the shooting and before his arrest. Those witnesses testified that Engen told them that he was robbed, that the gun "just went off" as he was getting out of the car, and that he shot at the car as it was driving away. One witness also testified that Engen asked him to get rid of the gun for him.

¶4 The State also presented physical evidence to support its theory that Lezine was in the back seat of the car when the shooting occurred. A forensic pathologist testified that, in addition to the gunshot wound, Lezine had injuries that were consistent with injuries from a breaking car window. Additionally, law enforcement testified that there was a large amount of blood inside of the car and some blood on the outside of the car, but no blood on the street.

¶5 The defense theory was that Engen shot Lezine in self-defense. In support, Engen testified to the following. After Engen entered the back seat of the car for the planned marijuana sale, Lezine attacked him. Engen feared for his life. Engen managed to get out of the car and rolled onto the ground with his backpack, which he alleged contained the marijuana and the gun. The car pulled into a driveway and stopped about fifteen feet away from Engen, and Lezine got out of the car and advanced rapidly towards Engen. Engen got up on one knee and took the gun out of the backpack. He warned Lezine that he had a gun and told Lezine to stop or he would shoot. Engen believed that Lezine was advancing too fast for him to get away, and that Lezine was coming to attack him and get the marijuana.

When Lezine was about five feet away and still advancing towards him, Engen started shooting.

¶6     Engen also presented testimony by a forensic analyst who opined that the bullets struck the car at a slightly upward angle, and that a bullet hitting a car window at that angle is more likely to ricochet off the window while still breaking the glass and then travel in a different direction. The analyst also concluded that, when the car was shot, it either was not moving or was moving extremely slowly.

¶7     In closing arguments, the prosecutor argued that the evidence contradicted Engen's testimony that he acted in self-defense. The prosecutor noted that Engen denied that Lezine had taken the marijuana from him before the shooting, and then stated: "But, he testified for the first time this week, so, this is the first time we heard this version." The prosecutor argued that the jury should "contrast [that] story … to what he told his friends and acquaintances right after the incident." The prosecutor also argued that the large amount of blood in the car and the lack of blood in the street contradicted Engen's testimony that Lezine was shot in the street as he advanced towards Engen.

¶8     The defense argued in closing that the evidence supported Engen's testimony that he acted in self-defense when Lezine approached him outside of the car to get the marijuana. Trial counsel argued that it made the most sense that Engen fired the shots in quick succession at Lezine, and that Lezine then got back in the car and the car sped away. Trial counsel pointed to evidence that Lezine and the others did not have any of the marijuana after the shooting. Counsel argued that the State could not explain away the evidence that a bullet struck Lezine at a downward angle, but that the bullets struck the car at an upward angle.

Trial counsel also cited the prosecutor's argument that the jury instruction requires a finding of intent to kill and that shooting someone at point blank range shows an intent to kill. Trial counsel argued that it was the defense theory, not the prosecution theory, that Lezine was shot at point blank range, and said: "I don't know if [the prosecutor], this was bringing him around. But based on the evidence that we see in this case, [Engen] did shoot [Lezine] at point blank range."

¶9 In rebuttal, the prosecutor refuted the defense argument that the evidence was bringing the prosecutor around to the theory of self-defense: "I can say quite affirmatively that is not bringing me around, right? I believe[,] the State believes, the police officers believe, we all believe here that Kyle Engen is guilty of second degree intentional homicide, and attempted second degree intentional homicide." The prosecutor argued that the jury should consider Engen's "own words, the behaviors, that his friends, his acquaintances saw the night of this incident." The prosecutor argued that Engen's trial testimony fit the facts and the defense theory of self-defense only "[b]ecause he's had two years to think about it" and he had "known the evidence for two years," so "[o]f course, his story should fit pretty well" with the defense theory at trial. The prosecutor argued that, based on all the facts, the prosecutor believed that Engen thought he was acting in self-defense by shooting at the car after he was robbed, but when Engen talked to his attorney and realized that would not be self-defense, Engen's story had to "move to fit the facts."

¶10 The jury found Engen guilty of the charges. The circuit court sentenced Engen to 18 years of initial confinement and 10 years of extended supervision.

¶11     Engen filed a postconviction motion arguing that he was entitled to a new trial based on prosecutorial misconduct and ineffective assistance of counsel. Specifically, he argued that the prosecutor improperly: (1) commented during cross-examination and closing arguments on Engen's right to remain silent; (2) vouched for the evidence by stating that both the prosecutor and the police officers believed that Engen was guilty; and (3) argued that Engen changed his version of the events to fit with a theory of self-defense after consulting with his attorney, suggesting that defense counsel suborned perjury.  He argued that his trial counsel was ineffective by failing to object to the improper questioning and argument and by failing to present testimony by a bloodstain pattern expert to support Engen's theory of self-defense.  Alternatively, he sought a new trial in the interest of justice because the real controversy was not fully tried based on those errors.

¶12     The circuit court held a *Machner* hearing.[1]  At the hearing, Engen's trial counsel testified that he did not object when the prosecutor asked Engen if it was fair to say that his testimony at trial was the first time the prosecutor heard Engen's version of the story because counsel understood that question to reference prior testimony as to statements Engen made to others shortly after the shooting that were inconsistent with his trial testimony.  Counsel testified that he did not object to the prosecutor's closing arguments about Engen providing his version for the first time at trial for the same reason: counsel understood the argument to be a permissible reference to the prior testimony concerning what Engen told others

---

[1] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).  A *Machner* hearing is "[t]he evidentiary hearing to evaluate counsel's effectiveness, which includes counsel's testimony to explain [counsel's] handling of the case." *State v. Balliette*, 2011 WI 79, ¶31, 336 Wis. 2d 358, 805 N.W.2d 334.

after the shooting that was inconsistent with Engen's testimony at trial. Counsel agreed that he should have objected to the prosecutor's statement that both the prosecutor and the police officers believed that Engen was guilty. He also agreed that he should have objected when the prosecutor argued that Engen changed his story to fit the self-defense theory after talking to counsel. Counsel testified that he did not consider obtaining testimony by a bloodstain pattern expert because he did not think it was important to the defense.

¶13    The circuit court denied the postconviction motion. Engen appeals.

## DISCUSSION

¶14    On appeal, Engen reasserts the claims he made in his postconviction motion. First, he contends that the prosecutor committed misconduct by: (1) commenting on Engen's pretrial exercise of his right to silence; (2) vouching for the evidence and expressing personal and law enforcement opinions of Engen's guilt; and (3) falsely implying that the defense suborned perjury at trial. He argues that the prosecutorial misconduct warrants a new trial based on plain error, in the interest of justice, or ineffective assistance of counsel. Second, he contends that his trial counsel was ineffective by failing to present evidence by a bloodstain pattern analyst. We address, and reject, each argument in turn.

## I.  Prosecutorial Misconduct

¶15    The determination of whether prosecutorial misconduct occurred is within the circuit court's discretion. *State v. Lettice*, 205 Wis. 2d 347, 352, 556 N.W.2d 376 (Ct. App. 1996). When we review a circuit court's exercise of discretion, we look to whether the court examined the relevant facts, applied a

proper standard of law, and used a rational process to reach a reasonable conclusion. *Id.*

*A. Commenting on Engen's Right to Silence*

¶16    Engen argues that the prosecutor committed misconduct while cross-examining Engen and during closing arguments by commenting on Engen's exercise of his right to remain silent after his arrest and receipt of *Miranda* warnings. *See **State v. Brecht***, 143 Wis. 2d 297, 316, 421 N.W.2d 96 (1988) ("It is well established that it is fundamentally unfair and a violation of a defendant's constitutional right to due process to use a defendant's silence after receipt of *Miranda* warnings for impeachment purposes at trial.").

¶17    When deciding whether a challenged question or comment by a prosecutor was an impermissible comment on a defendant's right to remain silent, we must determine "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the defendant's right to remain silent." ***State v. Nielsen***, 2001 WI App 192, ¶32, 247 Wis. 2d 466, 634 N.W.2d 325.  We "look at the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact on the jury." *Id.*  "Whether a defendant's right to remain silent was violated is a question involving the application of constitutional principles to undisputed facts that we review de novo." *Id.*

¶18    Engen argues that the prosecutor improperly invoked Engen's post-arrest and post-*Miranda* silence by: (1) asking Engen on cross-examination, after Engen gave his account of the shooting in support of his self-defense theory, "[s]o, it's fair to say that this is the first time I've heard this version of the facts, right?"

to which Engen responded, "Correct"; (2) arguing in closing that, while Engen testified at trial that he was not robbed, "[Engen] testified for the first time this week, so, this is the first time we heard this version"; and (3) arguing in rebuttal that Engen's testimony "fit the evidence so perfectly" because "he's had two years to think about it…. He's had the evidence, he's known the evidence for two years. Of course, his story should fit pretty well here today, or this week," and referring to his testimony as his "story" that "he told you after knowing all the evidence, knowing how all the evidence lines up." Engen argues that he was in custody and had invoked his right to remain silent under *Miranda* pending trial and that the prosecutor broadly referenced the fact that Engen gave his side of the story for the first time when he testified at trial, so the prosecutor was necessarily commenting on Engen's post-arrest silence. Engen argues that the prosecutor failed to properly limit his comments to contrasting Engen's pre-arrest statements with Engen's trial testimony, and that the prosecutor's comments were therefore broad enough to reference Engen's post-arrest silence.

¶19   Engen argues that *Brecht* is instructive and should dictate the outcome here. In *Brecht*, the defendant shot and killed his brother-in-law. Two witnesses who interacted with the defendant after the shooting and before his arrest testified that the defendant did not mention the shooting to them. *Brecht*, 143 Wis. 2d at 302-05. The arresting officer testified that, when the defendant was arrested, he said that it was a "big mistake" but gave no other explanation. *Id.* at 305. The defendant invoked his right to silence under *Miranda* and gave no other statements before trial and testified at trial that the shooting was accidental. *Id.* at 303-05.

¶20   The supreme court held that the following question and closing argument by the prosecutor at trial violated the defendant's due process rights by

improperly commenting on his post-*Miranda* silence: (1) asking the defendant in cross-examination, after the defendant gave his version of the shooting to support the defense theory that the shooting was accidental, "[i]n fact the first time you have ever told this story is when [you] testified here today[,] was it not?"; and (2) arguing in closing that the defendant "never volunteered until in this courtroom what happened …. [The defendant] sits back here and sees all of our evidence go in and then comes out with this crazy story"; and the prosecutor's comments that had the prosecutor been in the defendant's shoes, the prosecutor would have said "hold on, this was a mistake, this was an accident, let me tell you what happened," but that the defendant "didn't say that[,] did he. No, he waited until he hears [the State's] story." *Brecht*, 143 Wis. 2d at 315-16.

¶21 The *Brecht* court held that "[t]he State's assertions that [the defendant] did not volunteer his explanation of the accidental nature of the shooting until the State presented its evidence at trial were comments on the defendant's post-*Miranda* silence and as such were constitutional error." *Id.* at 316-17. Engen argues that "[t]he prosecution's strategy was exactly the same here: arguing Engen's testimony was fals[e] because it was the first time he told this 'version,' and he didn't volunteer this information until after seeing all of the State's evidence." As in *Brecht*, Engen argues that it was a clear violation of Engen's due process rights. We are not persuaded.

¶22 Here, unlike in *Brecht*, the State presented evidence that Engen made multiple statements to others about the shooting before his arrest that contradicted Engen's trial testimony. After the prosecutor asked Engen whether Engen's trial testimony was the first time that the prosecutor heard Engen's version of events, and after questioning Engen about the physical evidence that conflicted with Engen's version, the prosecutor asked Engen about the statements

he made to others that the gun just went off and that he had been robbed before the shooting. Similarly, in closing arguments, the prosecutor argued that the evidence—including evidence as to what Engen told others shortly after the shooting—contradicted Engen's trial testimony that he had not been robbed and that he fired the gun in self-defense, stating that Engen "testified for the first time this week, so, this is the first time we heard this version." Again, the prosecutor contrasted Engen's trial testimony with his prior statements to others the night of the shooting, arguing that the jury should "contrast [that] story … to what he told his friends and acquaintances right after the incident." After the defense argued that the jury should believe Engen's testimony that he acted in self-defense, the prosecutor argued that the jury should consider Engen's "own words, the behaviors, that his friends, his acquaintances saw the night of this incident." The prosecutor then argued that Engen's trial testimony fit the facts and the defense theory of self-defense only "[b]ecause he's had two years to think about it" and he had "known the evidence for two years," so "[o]f course, his story should fit pretty well" with the defense theory at trial.

¶23 Thus, unlike in ***Brecht***—where the prosecutor contrasted the defendant's pretrial *silence* with his trial testimony—the prosecutor here specifically contrasted Engen's pre-arrest *statements* with his trial testimony. On that basis, ***Brecht*** is distinguishable.

¶24 We recognize that, as Engen argues, the prosecutor's comments about Engen providing this version of his story for the first time at trial, and having "two years" to come up with that version after having heard all of the State's evidence, facially appear to encompass Engen's post-***Miranda*** silence while he was in custody before trial. However, we are required to look at those comments in context rather than isolation. *See **State v. Cooper***, 2003 WI App 227,

11

¶19, 267 Wis. 2d 886, 672 N.W.2d 118 (courts must look to the "context in which the statement was made" in assessing whether a prosecutor's comment violated a defendant's right to remain silent). Here, taken in context, we cannot conclude that "the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the defendant's right to remain silent." *Id.* Rather, the prosecutor was contrasting Engen's testimony at trial with the conflicting statements he made shortly after the shooting, and argued that the jury should not believe Engen's trial testimony because of those inconsistencies. The natural implication from the prosecutor's comments was not that the jury should infer guilt because Engen did not provide any statements to police while he was in custody, but that the jury should not believe Engen's trial testimony because he gave conflicting statements to others immediately after the shooting. We therefore conclude that the prosecutor did not commit misconduct by commenting on Engen's post-arrest silence in the context in which the comments were made.

*B. Expressing Personal and Law Enforcement Opinions of Engen's Guilt*

¶25 Engen argues that the prosecutor improperly conveyed during his rebuttal in closing arguments that both the prosecutor and the police officers involved with the case believed that Engen was guilty. Engen argues that the prosecutor's comments crossed the line into vouching for the evidence. We disagree.

¶26 "A prosecutor may comment on the evidence, detail the evidence, argue from it to a conclusion and state that the evidence convinces [the prosecutor] and should convince the jurors." *State v. Hurley*, 2015 WI 35, ¶95, 361 Wis. 2d 529, 861 N.W.2d 174. However, it is improper for a prosecutor "to express [the

prosecutor's] personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant." *United States v. Young*, 470 U.S. 1, 8 (1985) (quoted source and alteration omitted). This is so for two primary reasons: because "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury"; and because "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id.* at 18-19. Thus, it is improper for a prosecutor to "to tell a jury what [the prosecutor] believes is the truth of the case, unless it is clear that the [prosecutor's] belief is merely a comment on the evidence before the jury." *State v. Jackson*, 2007 WI App 145, ¶22, 302 Wis. 2d 766, 735 N.W.2d 178.

¶27     Additionally, under the "invited reply" or "measured response" rule, a prosecutor may "respond[] reasonably in closing argument to defense counsel's attacks, thus rendering it unlikely that the jury was led astray." *See State v. Wolff*, 171 Wis. 2d 161, 168, 491 N.W.2d 498 (Ct. App. 1992). However, "[t]hat an argument or comment may have been invited by the other side does not invariably compel the conclusion that it can never be considered error." *Id.* at 168-69. Thus, "'the issue is not the prosecutor's license to make otherwise improper arguments, but whether the prosecutor's 'invited response,' taken in context, unfairly prejudiced the defendant.'" *Id.* (quoted source omitted).

¶28     Here, Engen acknowledges that the challenged comment by the prosecutor—that both the prosecutor and the police officers believed that Engen was guilty—was made in direct response to the defense argument that the prosecutor's closing argument indicated that the evidence was "bringing him

around" to the defense theory of self-defense. However, Engen argues that the prosecutor's statements in rebuttal went "far beyond" a fair response by stating that not only the prosecutor but also the police officers believed that Engen was guilty. Engen points out that the police officers did not testify to their personal beliefs about Engen's guilt, and therefore the prosecutor argued facts not in evidence. Engen argues that a proportionate response would have been limited to arguing that the prosecutor personally believed that Engen was guilty, without reference to what the police officers believed.

¶29 We conclude that the prosecutor's response in rebuttal was reasonable and did not unfairly prejudice Engen. To refute the defense's suggestion that the evidence may have convinced the prosecutor that Engen had shot Lezine at point blank range, which the defense argued supported Engen's self-defense claim, the prosecutor argued that both the prosecutor and the police officers involved in the investigation believed that Engen was guilty. In context, the prosecutor was refuting the claim that he was pursuing the charges despite not believing that Engen was guilty. That was a fair and measured response, and would not have done more than balance Engen's argument implying that the prosecution believed an aspect of Engen's self-defense claim.

¶30 Moreover, even accepting Engen's contention that the prosecutor crossed the line into improper argument by stating that the police officers, in addition to the prosecutor, believed that Engen was guilty, we are not persuaded that the comment rose to the level of prosecutorial misconduct. "The test to be applied when a prosecutor is charged with misconduct for remarks made in argument to the jury is whether those remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* at 167 (quoted source omitted). The single comment of including the police officers who had

testified on behalf of the State in the prosecutor's belief that Engen was guilty did not so infect the trial with unfairness as to deny Engen due process.

## C. Falsely Implying Defense Counsel Suborned Perjury

¶31    Engen argues that the prosecutor committed misconduct during closing arguments by falsely implying that defense counsel suborned perjury.  In rebuttal, the prosecutor reiterated the State's theory that Engen had been robbed and that he shot at Lezine to get Engen's marijuana back, and argued that Engen might have mistakenly believed that these actions constituted self-defense.  The prosecutor then stated: "Once you get out of that situation and you talk to your attorney about it and realize, yeah, that's really not self-defense.  Then the story has, you know, got to move to fit the facts.  I think that's exactly what you heard here this week…."  Engen argues that the prosecutor's argument falsely and improperly suggested that Engen told his counsel one version of the shooting and that he and his attorney then concocted a different story for his trial testimony.  Engen argues that the prosecutor's statement that "I think that's exactly what you heard here this week" created the impermissible impression that "evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant."  *See **Young***, 470 U.S. at 18-19.  He argues that "[k]nowledge privately shared with an attorney is precisely the type of area where a prosecutor might know information not privy to the jury."  Engen contends that the implication of perjury was both improper and completely false, as confirmed by defense counsel's testimony at the ***Machner*** hearing, and that Engen was prejudiced by the improper argument based on false information.  We disagree.

¶32    Contrary to Engen's argument, the prosecutor's statements in rebuttal did not imply that defense counsel instructed Engen to give false

testimony about the shooting. Rather, the prosecutor argued, consistent with the State's theory of the case, that *Engen* was lying at trial about the facts surrounding the shooting. Under the State's theory, and as argued by the prosecutor, Engen told others after the shooting that he had been robbed before he shot at Lezine as the car was driving away from him, but he then learned from his attorney that those facts would not support a defense of self-defense, so he changed his story. But, the prosecutor did not say that Engen told his *attorney* that he had been robbed and shot at the car as it was driving away and that his attorney then instructed him to give a different version of the facts in his trial testimony. Accordingly, we reject Engen's contention that the prosecutor improperly argued that defense counsel suborned perjury.

¶33 In sum, we conclude that the challenged comments by the prosecutor did not amount to prosecutorial misconduct, either individually or together. Because there was no prosecutorial misconduct, Engen is not entitled to a new trial under any of the theories he advances premised on prosecutorial misconduct.

## II. Ineffective Assistance Of Counsel

¶34 Engen argues that his trial counsel was ineffective by failing to present evidence from a bloodstain pattern analyst. A claim of ineffective assistance of counsel must show that trial counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "To prove constitutional deficiency, the defendant must establish that counsel's conduct falls below an objective standard of reasonableness." *State v. Love*, 2005 WI 116, ¶30, 284 Wis. 2d 111, 700 N.W.2d 62. "To prove constitutional prejudice, the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

16

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoted source omitted). Whether trial counsel's performance was deficient and prejudicial to the defense are questions of law that are reviewed independently on appeal. *See State v. Johnson*, 153 Wis. 2d 121, 128, 449 N.W.2d 845 (1990).

¶35 Engen contends that his trial counsel's failure to present evidence from a bloodstain pattern analyst at trial was deficient and prejudicial because that evidence was necessary to support the defense theory that Lezine was approaching Engen outside the car when Engen shot him in self-defense. He argues that a significant problem with his self-defense theory was that there was a large amount of blood inside the car and a lack of blood on the street, which supported the State's theory that Lezine was shot in the car as it was driving away, rather than outside of the car as he was approaching Engen. Engen argues that a bloodstain pattern analyst was necessary to counter the State's argument that the blood evidence confirmed the State's theory and to corroborate Engen's trial testimony that he shot Lezine while Lezine was outside the car and the car was not moving or moving slowly.

¶36 At the *Machner* hearing, Engen called bloodstain analyst Terry Laber, who testified to the following main points. First, the presence of blood in the car and the lack of blood on the street did not prove that Lezine was in the car when he was shot, because Lezine could have been shot outside the car but did not begin bleeding until he reentered the car. Second, the pattern of "projected" blood (blood that was "flowing" or "gushing" from Lezine's gunshot wound) from the back seat of the car on the trunk of the car indicated that the car was not moving or moving very slowly when the blood was deposited. Third, the pattern of broken glass in the back of the car established that someone was in the back seat of the car

17

when the rear window was shot and shattered. Fourth, there was a small amount of Lezine's blood on the outside of the rear driver's side door, which would have been deposited from outside the car. Laber opined that, because the blood evidence indicated that Lezine exited the car after the shooting from the rear passenger's side door and proceeded directly away from the car to the gym where he was found, Lezine's blood on the exterior driver's side door could have been deposited by Lezine if he was shot outside the car and then reentered the car from the rear driver's side door. Laber conceded that, alternatively, the blood on the exterior driver's side door could have been transferred by one of the other occupants of the car if Lezine's blood had been deposited on one of the occupants Finally, Laber opined that, according to the evidence as a whole, Lezine could have been outside the car or inside the car when he was shot.

¶37 Engen argues that Laber's testimony, if offered at trial, would have directly countered the State's closing argument that the lack of blood in the street and the large amount of blood inside the car proved that Lezine was inside the car when he was shot rather than outside and approaching Engen. However, Laber testified only that it was possible that Lezine had been shot outside the car despite the large amount of blood inside the car and lack of blood on the street. And, he

confirmed one key component of the State's theory: that Lezine was in the back seat of the car when the rear window was shot through and shattered.[2]

¶38     Engen also argues that Laber's testimony was necessary to dispute the State's theory that Engen shot at the car while it was driving away. He contends that Laber's opinion that the projected blood from the back seat was deposited on the trunk of the car while the car was not moving would have supported the defense argument that the car was not moving when Engen fired the gun. However, we are not persuaded that the projected blood evidence would have undermined the State's theory in any significant way. Even if it had countered the State's theory that the car was driving away when Engen fired the shots, it would not have directly countered the more important component of the State's case, that is, that Lezine was in the car when he was shot, which undermined Engen's theory of self-defense.

¶39     Engen also contends that Laber's testimony was necessary to support the defense theory that Engen shot Lezine outside the car by showing that the small amount of blood on the exterior driver's side door was deposited by Lezine after he was shot, as he was re-entering the car. However, while Laber opined that

---

[2] Engen argues that Laber's testimony that Lezine was in the back seat of the car when the rear windshield was shot through and shattered would not have been contrary to Engen's testimony because Engen could have shot Lezine when Lezine was outside of the car, and that Lezine could have then reentered the car while Engen was still shooting, so that Lezine would have been back in the car when the rear windshield was shot. However, that does not appear consistent with Engen's trial testimony. Engen testified that Lezine was about ten feet away from the car, coming toward Engen, when Engen fired about five shots "as fast as [he] could pull the trigger"; that Lezine turned away while Engen was shooting; and that Engen then ran in the opposite direction from the car. Engen testified that he did not know what Lezine did or what happened to the car after he fired the shots, because he immediately turned and ran. On cross-examination, the prosecutor asked Engen, "Was he still coming at you, or did he turn around and go back?" Engen answered, "As soon as I fired the shots, I got up and stumbled away and tried to run as fast as I could."

Lezine may have deposited the blood on the exterior driver's side door while Lezine was outside, possibly after he was shot, Laber conceded that the blood also could have been deposited by another occupant of the car after the shooting.

¶40 Considering the entirety of Laber's testimony at the *Machner* hearing, we are not persuaded that Engen was prejudiced by defense counsel's failure to call a bloodstain pattern analyst at trial. Ultimately, Laber could not give an opinion as to whether Lezine was inside or outside the car when Engen shot him, and in fact would have supported the State's theory that Lezine was in the back seat when the rear windshield was shot through and shattered. Whether Lezine was inside the car as it moved away or outside the car approaching Engen when Engen shot him was the crux of the case, and without an opinion on that point, Laber's testimony would not have provided a reasonable probability of a different outcome at trial.

¶41 Accordingly, for the reasons explained, we affirm the judgment of conviction and the order denying the postconviction motion.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2023-24).